UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------

JACK J. GRYNBERG, GRYNBERG
PRODUCTION CORPORATION (TEXAS),
INC., GRYNBERG PRODUCTION
CORPORATION (COLORADO), INC., and
PRICASPIAN DEVELOPMENT
CORPORATION (TEXAS),

                           Plaintiffs,                    06 Civ. 6494 (RJH)

            -against-                           **MEMORANDUM OPINION
                                                    AND ORDER**
BP, P.L.C., d/b/a BP CORPORATION NORTH
AMERICA, INC., a foreign corporation,
individually and as the successor in interest to
ARCO INTERNATIONAL OIL AND GAS
COMPANY,

                           Defendant.

----------------------------------------

Richard J. Holwell, District Judge:

    Plaintiff Jack J. Grynberg,[1] an oil and gas expert, has sued defendant ARCO,[2] an

oil company, for breach of fiduciary duty and unjust enrichment.  Grynberg contends that

he shared secret Russian and Kazakh oil data with ARCO in 1990, and that ARCO later

used that data to its own benefit despite a fiduciary obligation not to.  The parties have

had discovery, and ARCO has moved for summary judgment on several grounds.

Among them are the arguments that: (1) there is no genuine issue of fact as to whether

---

[1] In addition to Mr. Grynberg, the plaintiffs in this case include several corporations owned or
controlled by him.  All raise basically identical claims.  For the sake of clarity the Court refers to
them collectively as Plaintiff Jack Grynberg throughout this opinion.

[2] ARCO is not the captioned defendant, but rather was the predecessor in interest to the captioned
defendant, BP.  Since the relevant entity was known as ARCO during the events at issue in this
case, for the sake of clarity the Court refers to the defendant as ARCO throughout this opinion.

ARCO actually used Grynberg's information, and (2) there is no genuine issue of fact as to whether the alleged use of Grynberg's information caused any benefit to ARCO.[3]  For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

## BACKGROUND

Taken in the light most favorable to plaintiff, as the party against whom summary judgment is sought, the record, which includes depositions, declarations, and documentary exhibits from both plaintiff and defendant, indicates the following.

### A. 1990-1992

Soviet natural resources, including those in Kazakhstan, were unavailable to Western development during the cold war, a situation that began to change in 1990 and 1991 as that conflict drew to its blessedly anticlimactic close.  Western oil interests were eager to capitalize on the geopolitical shift, since the immense natural resources in former Soviet territories presented great investment potential.  The path was by no means clear however: the emerging political systems were in evolution, Westerners had few connections with the new ruling class of the former Soviet bloc, and little geological data had passed through the iron curtain.  Westerners did not know where to deal or who to deal with.  It was amidst this backdrop that a potential development deal between Jack J. Grynberg and ARCO would develop.

Jack J. Grynberg is an oil and gas expert of some renown: he has several advanced degrees related to resource development, has published significantly in the field, and has personally made major discoveries at Powder Wash Basin, in the Nitchie

---

[3] Because these arguments provide two independent bases for the relief defendant seeks, the Court does not reach ARCO's other arguments for summary judgment.

Gulf Field, and in the Tallahala Creek Oil Field, among several others.  (Pltfs. 56.1 Stmt. ¶¶ 1-2.)  He also speaks, reads, and writes fluent Russian.  (Id. at ¶ 4.)  In September of 1989, this latter skill led him into a serendipitous situation.

While attending the American Mining Congress' 1989 annual meeting in San Francisco, Mr. Grynberg "noticed two burly gentlemen who he assessed to be Russian and who sounded lost."  (Id.)  Thanks to his fluency in Russian, Mr. Grynberg was able to help them find their way and, what's more, went on to befriend them over the next few days.  (Id.)  As it happened, one of those men was Professor Doctor Eugency Ivanovich Shemyakin, the Chairman of the Soviet Supreme Attestation Commission.  (Id.)  In gratitude for all of Grynberg's help, Shemyakin rewarded him with a unique opportunity—an invitation to travel to the Soviet Union to see the seismic data on the Caspian Sea and on the area around the Caspian Sea known as the Pri-Caspian Basin. Accepting that invitation, Grynberg became "the first Western scientist allowed to analyze and interpret [Soviet seismic data on the Pri-Caspian Basin]."  (Id. at ¶ 5.)

Grynberg's serendipity did not end there.  Several weeks later he befriended Nursultan Abisevich Nazarbaev, the First Secretary of the Communist Party of Kazakhstan, under similarly unusual circumstances.  (Pltfs. 56.1 Stmt. ¶ 6.)  As an investment, Grynberg was feeding 40,000 steers in Fort Morgan Colorado, and the U.S. State Department called him up and asked him to host a Kazakh delegation that was coming to Denver to examine cattle feeding operations.  (Id.)   As it happened, Nazarbaev was in the delegation, and "hit it off" with Grynberg over the course of the trip.  (Id.) Grynberg was subsequently invited to Kazakhstan, where over the course of several trips he analyzed substantial technical information regarding Kazakh oil fields, and developed

a relationship with the Kazakhs to the point that he was authorized to form an international resource development consortium.  (Id. at ¶¶ 6-14.)

In the hopes of developing the consortium authorized by the Kazakhs, Grynberg contacted several Western oil companies.  Among the numerous companies that he contacted and shared his information with was ARCO.  In September of 1990 Grynberg approached ARCO about potential projects in the Kazakh portion of the Pri-Caspian Basin.  In the course of those early dealings with ARCO, Grynberg provided the company with assertedly confidential information that he had garnered from the Kazakhs and Soviets, as well as with his economic evaluations as to a number of potential projects in the region.  Grynberg provided ARCO with "packages of various confidential, technical data including maps, geologic maps showing structures, seismic lines, seismic cross sections and reservoir engineering."  (Pltfs 56.1 Stmt. ¶ 17.)  Several major potential projects were discussed, including as relevant here: (1) the giant oil field of Tengiz, one of the world's 10 largest oil fields, (2) other oil fields in Kashagan and Karachaganak, and (3) the need for a new oil pipeline to service the Pri-Caspian Basin.  (Grynberg Dep. 756:4-9; Pltfs 56.1 Stmt. ¶¶ 16, 17, 21.)

The parties dispute whether the information Grynberg provided to ARCO was particularly useful in light of materials that were publically available at the time.  (Pltfs. 56.1 Stmt. ¶ 43.)  However plaintiff's expert, Mr. Grynberg himself, advises that aspects of his information were superior to the sources publically available in 1990.  (Abrams Decl. Ex. B-3, 3.)  Grynberg notes in particular that the publically available sources did not, as did his information, focus on the presence of mercaptans in the Tengiz oil.  (Id.)  Mercaptans were a toxin in the oil that posed a substantial barrier to its profitable sale.

Grynberg also notes that he had more accurate data regarding the Devonian layer of the Tengiz field, which he projected would contain significant *mercaptan-free oil*.  Since the publically available sources did not discuss the mercaptan problem or the mercaptan-free oil in the Devonian, "these articles [did] not mention the feasibility of developing and producing the Tengiz Devonian oil if the mercaptan removal issue was not readily solved."  (Id.)   Furthermore Grynberg contends that his information was of greater accuracy and quality to that which was available to the public at the time.

In October 1990, after several meetings between ARCO and Grynberg, ARCO entered into an agreement with Grynberg, the "Letter Agreement."  (Rhodes Decl. Ex. 26.)  The Letter Agreement established an "area of mutual interest" between ARCO and Grynberg roughly corresponding to the Kazakh portions of the Pri-Caspian basin (which includes Tengiz).  (Id.)  Briefly described, the Letter Agreement provided for a consortium of oil companies to work together with Grynberg towards eventually developing resources in the area of mutual interest.  Among other things, the agreement provided for Grynberg to receive a portion of any jointly developed opportunity.  (Id. ¶ 5.)  The agreement was not open ended however, it provided that "[t]his agreement and all obligations contained herein will expire on June 30, 1993."  (Id. ¶ 11.)

Unfortunately for Grynberg, ARCO, and the other prospective members of their consortium, there was another Western player vying for Kazakh oil rights.  In the late 1980s, Chevron had begun negotiations with the Soviet Union to develop the Tengiz field, and in the spring of 1990 Chevron was given access to all of the same data regarding Tengiz that Grynberg had seen.  (Rhodes Decl. Ex. 29, Rhodes Decl. Ex. 9, Grynberg Dep. at 39:8-40:13.)  In 1993, the Kazakh government and Chevron formed the

TengizChevroil partnership, focused on exploiting the Tengiz field.  Rights to another field in the area of mutual interest, Karachaganak, were won by British Gas in June 1992 (Rhodes Decl. Ex. 24 at BPLA057006.)  When the Letter Agreement expired in 1993, ARCO was not involved in any development in the area of mutual interest.

### B.  1995-1998

In the summer of 1995, ARCO commenced joint venture discussions with one of Russia's largest oil companies, Lukoil, and in September 1995 it purchased $250 million in convertible preferred bonds publically offered by Lukoil.  Although ARCO was "aware that Kazakhstan was of interest to Lukoil," (Pltfs. 56.1 Stmt. ¶ 70), at the time of this first bond purchase Lukoil operated primarily in Siberian Russia, "its traditional area of business," and had no interests in Tengiz.  (Rhodes Decl. Ex. 36 at BPLA031928, BPLA031951.)  Thus ARCO sent employees to investigate Lukoil's Siberian reserves, but ARCO was not evaluating the Tengiz oil field prior to the decision to purchase the Lukoil bonds.  (Rhodes Decl. Ex. 7, Eisele Dep. 50-53.)  ARCO's then-CEO Michael Bowlin testified that ARCO

> participated in the … convertible bond issue … with Lukoil, with the anticipation that they would be a very favorable partner who would be able to get us in on exploration and development concessions in a large number of areas, Siberia, Azerbaijan, Kazakhstan, the Greater Caspian area.
> (Rhodes Decl. Ex. 3, Bowlin Dep. at 27-28, 33-34.)

There is no direct evidence that Pri-Caspian development was the reason for this first bond purchase, or that any of Grynberg's materials were used.  Rather, ARCO's then-CFO Ronald Arnault was a lead proponent of the purchase,  (Rhodes Decl. Ex. 3, Bowlin Dep. at 32:7-33:19; Decl. Ex. 7, Eisele Dep. at 48:2-16, 51:25-52:11, Decl. Ex. 1, Arnault Dep. at 41:12-19, 40-42), and has testified that the focus of the purchase was not

the possibility of future investment in the Pri-Caspian region, and that he did not remember hearing the name Jack Grynberg until this lawsuit was filed.  (Rhodes Decl. Ex. 1, Arnault Dep. at 29:22-25, 48.)  Moreover neither Arnault nor anyone else involved in the transaction recalls receiving any of Grynberg's information, (Decl. Ex. 1, Arnault Dep. at 29:22-25, 101:17-21; Decl. Ex. 3, Bowlin Dep. at 19:5-10, 21:15-23, Decl. Ex. 7, Eisele Dep. at 21:16-18), and none of the individuals that plaintiff alleges received his information worked on the bond purchase.  (See Def. Mem. 10-11; *cf.* Rhodes Decl. Ex. 22 at 3, 7-8 *with* Rhodes Decl. Ex. 3, Bowlin Dep. at 27:2-28:8; Rhodes Decl. Ex. 7, Eisele Dep. at 45:23-49:7; Rhodes Decl. Ex. 1, Arnault Dep. at 40-42; Rhodes Decl. Ex. 15, Sullivan Dep. at 50:25-51:23; Rhodes Decl. Ex. 6, Downey Dep. at 34:23-36:14.)

By February 1996, ARCO was exploring the possibility of further investments through Lukoil, now with a particular focus on the Tengiz oil field in Kazakhstan.  A February 1996 slide show produced from ARCO's files focuses in detail on the Tengiz field, its investment potential, and the nuts and bolts of possibly taking over the TengizChevroil contracts.  (Abrams Decl. Ex. JJ.)  Although plaintiff contends that the slides show that ARCO had used Grynberg's information, the slide show itself states that its analysis is "based on limited data available in [the] public domain." (Id.)  Indeed, several contemporaneous public domain sources of Tengiz material have been produced from ARCO's files.  Furthermore the technical values in the slideshow differ from those provided by Grynberg to ARCO: (1) where Grynberg's "porosity" was 6% avg, the slides report a range from 6% to 22%, (2) where Grynberg's "permeability" was 10 md avg, the slides report 100md, and (3) where Grynberg's "Areal Extent" was 84,000 – 143,300 acres, the slides report 50,000 – 143,000 acres.  (*cf.* Abrams Decl. Ex. JJ with Rhodes

Decl. Ex. 20 (1990 Grynberg Trip Report); see Def. Repl. Mem. 25.)  Only the "oil gravity" figure, 46 API, is a match between the Grynberg report and the 1996 slides, however three of four publically available sources report that precise figure as well.  (See Def. Repl. Mem. 25.)

In March 1996, ARCO purchased additional Lukoil bonds and entered into a "Cooperation Agreement" with Lukoil as a step towards pursuing opportunities in and around the Caspian Sea.  (Pltfs. 56.1 Stmt. ¶ 78.)  Through the Cooperation Agreement the companies created "Lukarco," a joint venture owned 46% by ARCO and 54% by Lukoil.   (Pltfs. 56.1 Stmt. ¶ 79.)

The newly formed "Lukarco" made two major investments, one in Tengiz and another in the Caspian pipeline.  As regards the pipeline, in April of 1996, a Caspian pipeline Restructuring Protocol gave Lukoil a 12.5% interest in the Caspian pipeline, (Pltfs. 56.1 Stmt. ¶ 80), and in September 1996 the ARCO Board of Directors approved a Lukarco purchase of the 12.5% Caspian pipeline interest, valued at up to $637 million. (Rhodes Decl. Ex. 49-51.)  There is no direct evidence that ARCO used any of Grynberg's information or contacts when evaluating and consummating the Caspian pipeline investment.  Rather, (1) Oman, a pipeline consortium member, initially invited ARCO to consider a Caspian pipeline investment (Rhodes Decl. Ex. 2, Boubel Dep. at 27-28; Ex. 46 at BPLA046154); (2) the ARCO employees involved in the investment testified that they were unaware of any Grynberg information on the subject, and did not recall using any Grynberg information, (Rhodes Decl. Ex. 2, Boubel Dep. at 18:23-19:14; Rhodes Decl. Ex. 14, Smith Dep. at 28:20-22; Rhodes Decl. Ex. 7, Eisele Dep. at 21-22); (3) none of the individuals who allegedly received the Grynberg information were

8

involved in the evaluation of the Caspian pipeline investment (See Def. Mem. 14); and (4) ARCO's evaluation of the Caspian pipeline was based on information learned from Oman's data room and from discussions with other pipeline investors.  (Id.).

As regards Tengiz, Lukoil approached ARCO in early 1996 with a proposal for Lukarco to purchase from Chevron a 5% interest in TengizChevroil, the partnership that had been operating the Tengiz field since 1993.  (Rhodes Decl. Ex. 1, Arnault Dep. at 76:17-22.)  ARCO's board of directors formally authorized a $200 million purchase from Chevron in February of 1997, (Rhodes Decl. Ex. 42), and the transaction closed in April 1997.  (Rhodes Decl. Ex. 44.)  There is no direct evidence that ARCO used Grynberg's information or contacts when evaluating and consummating the TengizChevroil investment.  Rather, (1) all four deponents who were involved in evaluating Tengiz for ARCO were unaware of any use by ARCO of Grynberg's information, and none recalled using Grynberg's information themselves (Rhodes Decl. Ex. 10, Jinks Dep. at 97:20-99:2; Rhodes Decl Ex. 7, Eisele Dep. at 21-22, 28:9-16; Rhodes Decl Ex. 3, Bowlin Dep. at 21:15-23, 57:6-8; Rhodes Decl. Ex. 14, Smith Dep. at 28:20-22); (2) the deal was brought to ARCO by Lukoil through Chevron, not through Grynberg's contacts; and (3) none of the individuals who allegedly received the Grynberg information were involved in evaluating the Tengiz investment. (See Def. Mem. 12.)

ARCO's evaluation of the Tengiz investment proceeded in two phases.  First, ARCO reviewed the investment internally, using—according to the ARCO employees deposed—publically available sources.  ARCO's corporate designee, Doug Eisele, advised that ARCO relied on two public subscription-based reports on Tengiz, one from PetroConsultants and another from Wood Mackenzie.  (Pltfs. 56.1 Stmt. ¶ 82.)  Elizabeth

Jinks, an ARCO employee, prepared an internal screening analysis of the Tengiz region. (Rhodes Decl. Ex. 10, Jinks Dep. 27.)  Although that screening analysis was not produced in this litigation, she testified that the screening analysis was based on the Wood-Mackenzie report, and that it was developed as a means of preparing to go to the Chevron data room to acquire data for a full analysis of Tengiz.  (Id.)  ARCO's second phase in evaluating Tengiz was its trip to Chevron's Tengiz data room in August 1996. The trip was apparently very successful—in an August 26, 1996 email titled "Tengiz update," ARCO employee E.J. Havard wrote

> …General Trip Results
> ARCO was successful at getting the technical data requested to better assess the value of Tengiz.  Chevron provided the requested items from the data room and several additional items to respond to our questions.  We have a good sense of the minimum value to ARCO, and we are still examining the various upsides to understand the maximum value. …"      (Rhodes Decl. Ex. 41).

There is no mention of Grynberg or any of his information, input, sources, or analysis in any of the contemporaneous records of the Tengiz evaluation.

### C.  Litigation History

This is not the first case commenced by Grynberg arising out of the potential consortium to develop resources in the area of mutual interest.  In 1993, Grynberg sued former prospective consortium member British Gas over BG's acquisition of rights to the Karachaganak field.  *See Grynberg Production Corp. v. British Gas, PLC*, 817 F. Supp. 1338 (E.D. Tex. 1993).  That first suit against BG settled, but subsequently in 2008 Grynberg filed a federal RICO suit against BG arising out of the early 90s consortium. *See Grynberg v. BP PLC*, 585 F. Supp. 2d 50 (D.D.C. 2008).  The 2008 BG suit was referred for arbitration.  *Id.*  In 2003, Grynberg filed suits against Shell and Total, two other potential consortium members, alleging unjust enrichment and breach of fiduciary

10

duty arising from those companies' alleged use of Grynberg's confidential information and contacts.  *See Grynberg v. Total, SA*, 538 F. 3d 1336 (10th Cir. 2008).  In a decision released after this Court determined that the timeliness of *this* action was a jury question, the Tenth Circuit affirmed summary judgment in both the Shell and Total cases, finding that both actions were untimely.[4]

Plaintiff commenced this particular suit on August 28, 2006, originally complaining that ARCO had used plaintiff's information to invest in Tengiz and the Caspian pipeline.  On July 15, 2009, following a first phase of discovery, the Court permitted plaintiff to amend his complaint to add allegations regarding ARCO's investment in Lukoil and ARCO's use of information to *not* invest in fields in the area of mutual interest.  The amended complaint states two claims: (1) that ARCO breached a fiduciary duty by using Grynberg's confidential information to invest to its own benefit in Tengiz and the Caspian Pipeline, and (2) that ARCO was unjustly enriched by its use of Grynberg's confidential information to its own benefit.  After the Court denied ARCO's first motion for summary judgment on statute of limitations grounds, on December 2, 2009, ARCO moved for summary judgment on the merits, and on September 28, 2010, the parties appeared for oral argument.  For the following reasons summary judgment is granted and this case is dismissed in its entirety.

---

[4] In the present case, the Court concluded that there was a question of fact as to whether Mr. Grynberg became aware of ARCO's 1995 and 1996 investments in Lukoil and Lukarco prior to March of 2006, despite significant publicity surrounding the investments and Mr. Grynberg's repeatedly professed expertise in the oil and gas field.  As such the Court denied summary judgment on statute of limitations grounds, leaving the question to the jury.  [53], [54].  On a somewhat different factual record involving different oil companies and transactions, the Tenth Circuit upheld grants of summary judgment on statute of limitations grounds, holding that Mr. Grynberg knew or should have known about the transactions at issue in light of his expertise and the publicity surrounding them.  *See Grynberg v. TOTAL, SA*, 538 F.3d 1336, 1348-1351 (10th Cir. 2008).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c) summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The plain language of Rule 56(c) mandates the entry of summary judgment … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 (1986).  A party moving for summary judgment—in this case defendant ARCO—may discharge its burden "by showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.

Federal Rule of Civil Procedure 56(e) requires that a party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  This requirement has particular value when a party's responsive documents are long on speculation and short on specific facts.  "[S]peculation alone is insufficient to defeat a motion for summary judgment."  *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n. 4 (2d Cir. 2006).  "The law is well established that conclusory statements, conjecture, or speculation are inadequate to defeat a motion for summary judgment."  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 85 (2d Cir. 2005).

# DISCUSSION

## A. Use

Plaintiff's theory of the case is that after the Letter Agreement between ARCO and Grynberg expired, ARCO used Grynberg's information to evaluate investments within the area of mutual interest, despite a legal obligation not to use the information. Specifically, plaintiff contends that (1) beginning in the summer of 1995 ARCO decided to involve itself with Lukoil for the purpose of eventually investing in Tengiz and the Caspian pipeline; and (2) it did that on the basis of the information about those investments that Grynberg had provided in 1991.[5] (Pltfs. Mem. 40-44.) However even taking every reasonable inference in plaintiff's favor, the record before the court does not support that second conclusion, that ARCO used Grynberg's information to decide to invest in either Tengiz or the Caspian pipeline through Lukoil. Moreover there is significant evidence to the contrary. Accordingly, summary judgment is appropriate because plaintiff has failed to raise a genuine issue of material fact as to whether ARCO used Grynberg's information.

---

[5] Plaintiff appears to have abandoned his claims, raised in the amended complaint, arising out of several investment opportunities that ARCO chose *not* to pursue. Grynberg has not responded to ARCO's arguments, at pages 36-37 of its brief in support of summary judgment, that there is no evidence to support any of these claims. Were plaintiff still pressing these claims, they would fail. There is no evidence that ARCO even considered investments in Astrakhan, Greater Kashagan, or Buzachi; there is no evidence that ARCO considered plaintiff's information when evaluating the Dunga and Kashagan fields; and the evidence shows that plaintiff's information did not play a material role in ARCO's decision not to invest in Karachaganak. With respect to Karachaganak, the ARCO personnel involved relied not on Grynberg's information, cited briefly in a 1996 screening analysis, but on information from a 1998 Lukoil data room. (Rhodes Decl. Ex. 16, Weathersbee Dep. at 48:10-14, 59:2-60:2; Rhodes Decl. Ex. 5, Second 30(b)(6) Dep. at 152:11-13; Rhodes Decl. Ex. 55.)

In the enormous record before the court, there is no direct evidence that ARCO used Grynberg's information in evaluating Tengiz or the Caspian pipeline.  How ARCO came to make those investments is no mystery however: engineers and executives alike have testified in detail as to the evaluation and decision-making process.  (*See supra* 7-9.) With respect to both investments, publically available resources were used initially, and then supplemented at length in data rooms set up by the organizations managing the investment—for Tengiz the Chevron data room and for the Caspian Pipeline the Oman data room.  (Id.)  Further, although plaintiff's experts state generally that the publically available sources were inferior to Grynberg's information, plaintiff concedes that his information – obtained in 1989-90 – was "outdated" by 1996.  (Rhodes Decl. Ex. 10, Grynberg Dep. 515:12-15.)  Moreover, plaintiff admits that when Chevron invested in Tengiz it had been given access by the Kazakhs to all the information to which Grynberg was privy, information that would have been available in the comprehensive and up to date data rooms prepared for ARCO when it reviewed the Tengiz investment years later. (Rhodes Decl. Ex. 29, Rhodes Decl. Ex. 9, Grynberg Dep. at 39:8-40:13.)

Going beyond the evidence that ARCO reviewed sources other than Mr. Grynberg's information, there is other direct evidence that his information was not the basis of ARCO's investment analyses.  The data quoted in a February 1996 slideshow presented to ARCO's board of directors differs from the data Grynberg had provided in 1990.  (*See supra* 7-8; *cf* Abrams Decl. Ex. JJ (1996 slides) *with* Rhodes Decl. Ex. 20 (1990 Grynberg Trip Report).)  Also, the same engineers and executives who have testified about the subscription sources and data room trips they used to evaluate Tengiz and the Caspian pipeline have testified that they do not remember being aware of

Grynberg's information, much less using it.  ((Tengiz) Rhodes Decl. Ex. 10, Jinks Dep. at 97:20-99:2; Rhodes Decl Ex. 7, Eisele Dep. at 21-22, 28:9-16; Rhodes Decl Ex. 3, Bowlin Dep. at 21:15-23, 57:6-8; Rhodes Decl. Ex. 14, Smith Dep. at 28:20-22); (Pipeline) Rhodes Decl. Ex. 2, Boubel Dep. at 18:23-19:14; Rhodes Decl. Ex. 14, Smith Dep. at 28:20-22; Rhodes Decl. Ex. 7, Eisele Dep. at 21-22).

Although discovery has not revealed direct evidence that ARCO used Grynberg's information, and although discovery has revealed evidence to the contrary, plaintiff claims he has sufficient circumstantial evidence to avoid summary judgment.  He does not.

Plaintiff argues that ARCO's alleged use can be proven circumstantially, in much the same way that "use of a trade secret can be proven by showing access to the trade secret plus the subsequent similarity of the trade secret and a Defendant's product." (Pltfs. Mem. 38.)  Indeed, the law of trade secrets acknowledges the basic logic that when two products look alike, there is probably more than a coincidental connection between them.  *See Electro-Miniatures Corp. v. Wendon Co.*, 77 1 F.2d 23, 26 (2d Cir. 1985) (misappropriation provable by circumstantial evidence where company that had struggled to produce printed circuit slip rings suddenly "issued a catalog depicting an entire line of printed circuit slip ring assemblies, resembling those built by [the plaintiff]"); *Sokol Crystal Products, Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1432 (7th Cir. 1994) (misappropriation provable by circumstantial evidence where defendant's high frequency voltage controlled oscillators were similar to plaintiff's).  Nor is there any inherent reason to limit this approach to cases involving products (electrical or otherwise).  Logically, in any case where what is done or produced by the alleged thief bears some unique markers

of the allegedly stolen secrets, it may be inferred that the thief used the secrets.  Thus in *Rochester Midland Corp. v. Enerco Corp.*, No. 1:08-cv98, 2009 WL 1561817, *19 (W.D. Mich. June 1, 2009), use of pricing, product, and customer information could be inferred where eighteen accounts associated with a poached employee switched to the defendant company shortly after the confidential information was brought over.  However, the inference is only as strong as logic demands—where an alleged thief's products lack a suspicious similarity to the secrets, the inference would not lie.

Grynberg could make a circumstantial case for use under this theory, then, only to the extent that ARCO's actions bore the unique marks of his information, or showed a suspicious similarity to it.  ARCO did eventually make investments in Tengiz and the Caspian pipeline, which were among the investments that Grynberg had endorsed and relayed information about.  However ARCO also declined to pursue other investments Grynberg had advocated, such as the Karachaganak oil field also in the area of mutual interest.  Moreover nothing about ARCO's investments bears the markers of the Grynberg information in such a way as to justify inferring the use of that information.  It is not as if ARCO built wells at particular locations previously suggested by Grynberg, worked primarily through contacts developed by Grynberg, or tied its investments to Grynberg's numbers in a suspiciously similar way.  Rather, an oil company chose to invest in one of the largest oil fields in the world, in a manner different from that envisioned by Grynberg at the time he developed his proposed consortium.  That it did so is unsurprising and does not evince the kind of suspicious similarity present in *Wendon, Sokol*, and *Rochester Midland*.  Accordingly an inference of use based on similarity is not appropriate here.

There is a second reason that circumstantial evidence does not create a genuine issue of fact as to use here. The circumstantial use argument implicitly assumes that the information was useful to ARCO so that it would want to incorporate it into its investment planning. However as discussed *infra* in Section B, the Grynberg information was no longer particularly useful in 1995. Comparable information was publically available in 1995, the much discussed Mercaptan problem had been solved by Chevron, and Mr. Grynberg himself has testified that his information was out of date and, in any event, had also been provided to Chevron. It would therefore be unreasonable to infer, in the face of direct evidence to the contrary, that ARCO made any use of the Grynberg information in making its investment decisions.

Nevertheless, Grynberg asks the court to draw an adverse inference (of use) against ARCO because ARCO has not produced a Tengiz screening evaluation that the company apparently developed internally in 1996. (Pltfs. Mem. 43-44.) ARCO offers no explanation for why the document was not found during discovery, except to note the passage of 14 years between its creation and the discovery process. (Def. Rep. Mem. 28 fn. 25.) Purporting to reference *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998), plaintiff argues that "[t]he *unexplained absence* of a document germane to proof of an issue at trial can support an [adverse inference as to the document's contents]." (Pltfs. Mem. 43) (emphasis added).) However that is not the law. Rather, *Kronisch* repeats the familiar rule that "a party's *intentional destruction* of evidence relevant to proof of an issue at trial can support an [adverse inference]." *Kronisch*, 150 F.3d at 126 (emphasis added); *See Residential Funding Corp. v. DeGeorge Financial*, 306 F.3d 99, 109 (2d Cir. 2002) ("[W]here a party seeking an adverse inference adduces evidence that

its opponent destroyed potential evidence…in bad faith or through gross negligence…that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party."). Correcting plaintiff's inaccurate citation to *Kronisch* reveals why an adverse inference does not obtain here: it is not the unexplained absence of a document that may generate an adverse inference, but rather its intentional or grossly negligent destruction. Since there is no allegation (much less any proof) of bad faith or gross negligence here, plaintiff cannot claim the benefit of an adverse inference arising from the missing document.[6]

In arguing for this adverse inference, plaintiff points out that a different ARCO screening analysis makes reference to a single piece of information sourced to Grynberg. (Pltfs. Mem. 43.)  This screening analysis discussed Karachaganak, a field recommended by Grynberg that ARCO did not pursue.  Plaintiff contends that since Grynberg's information was used in a 1996 Karachaganak analysis, similar information must also have been used in the Tengiz analysis.  Of course, none of this is relevant to whether the Tengiz screening analysis was intentionally destroyed, and on that basis alone plaintiff is not entitled to an adverse inference, regardless of the Karachaganak analysis.

Leaving aside the law pertaining to adverse inferences and document destruction, scrutiny of the Karachaganak screening analysis actually weakens, not supports, plaintiff's argument that ARCO based its investment decisions on Grynberg's data.  The Karachaganak analysis makes what can only be described as *de minimis* use of Grynberg

---

[6] An adverse inference also requires that the destroying party have an obligation to preserve the evidence at the time it is destroyed.  *Kronisch*, 150 F.3d at 127.  There is no basis for concluding that ARCO had such an obligation at any time prior to the long delayed initiation of the present suit.

information, and in so doing it demonstrates that ARCO relied on numerous publically

available sources with similar content to the Grynberg data.  Such does not constitute use

of a trade secret—"if the contribution made by the trade secret is so slight that the actor's

product or process can be said to derive from other sources of information or from

independent creation, the trade secret has not been used."  Restatement (Third) Unfair

Competition § 40 comm. C (1995)).  Accordingly the Karachaganak screening analysis

citation should not be considered use, let alone provide the basis for an inference of use

of different data regarding a different oil field.

In the Karachaganak analysis, the author compiles a chart of the "reserves figures

quoted in the public domain" which lists six different public domain sources of reserve

figures.  The sixth is a "BP/StatOil" figure that the report sources to a 1992 internal

memo by Paul Fronterhouse.  (Rhodes Decl. Ex. 54.)  Turning back to the 1992 internal

memo, Fronterhouse explains that he received the BP study from Grynberg.  Thus, for

just one of six sources in the chart, the author used notes which were based on

Grynberg's copy of a study performed by another oil company.  That is the "use" in the

Karachaganak analysis.   Moreover this one source does not have any apparent impact on

the analysis—it is provided only to buttress the general picture painted by a range of five

other sources.   This "use" demonstrates that with respect to the Karachaganak field

Grynberg's data did not materially impact ARCO's work, which was based on numerous

publically available sources that contained basically the same information.  This fact

stands in stark contrast to plaintiff's allegations in this case—that ARCO "never spent a

dime" on research and based its investment decisions solely on Grynberg's word of years

prior.  (Pltfs. Mem. 2.)  Therefore not only does the Karachaganak screening analysis not

support an adverse inference against ARCO, but it further weakens Grynberg's argument that ARCO was relying on his data when making investment decisions.

Plaintiff's final argument on use is that ARCO technical employees should be presumed to have used Grynberg's information because there is an issue of fact as to whether Grynberg's data was in ARCO's files, and that "there is a presumption that a corporation has knowledge of what is in its files and records." (Pltfs. Mem. 42.) Plaintiff cites *First Interstate Bank of Denver v. Berenbaum*, 872 P.2d 1297, 1301 (Colo. App. 1993), a case where corporate knowledge was presumed for statute of limitations purposes, and *Murray v. Montgomery Ward Life Ins. Co.*, 196 Colo. 225, 229, 584 P.2d 78 (1978), a case where presumed corporate knowledge of a disclosed medical condition was discussed. But neither case stands for the proposition that a corporation can be charged with *use* of information in its files when that is an essential element of a cause of action. Further still from the caselaw is the presumption plaintiff seeks: that the employees of a corporation are presumed to have used information in corporate files when conducting their own work. Thus plaintiff has not supplied the Court with any basis to impose a presumption that ARCO employees used Grynberg's information when investigating the Tengiz and Caspian pipeline investments.[7]

Since the record does not support Grynberg's claim that ARCO used his information when analyzing Tengiz and the Caspian pipeline, and since there is no legal reason to charge ARCO with an adverse inference in that regard, defendant is entitled to summary judgment on the issue of use.

---

[7] This is especially so where, as here, there is evidence to the contrary. As *Murray* explains, the "effect of a presumption is to create a prima facie case, upon which judgment may be rendered *in the absence of contrary evidence*." *Murray*, 584 P.2d at 81. Even if a presumption of use were appropriate here—and that is far from the case—the evidence to the contrary would undo that presumption.

**B.  Causation and Benefit Obtained**

Independent of whether ARCO used Grynberg's data at all is the issue of whether any alleged use could have been a contributing factor in ARCO's investment decisions or could have provided a corresponding benefit to ARCO.   For a breach of fiduciary duty claim, "the defendant's breach must result in injury to the plaintiff or benefit to the defendant," *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. 2006), and an unjust enrichment claim requires that the defendant "benefits as a result of an unfair detriment to another."  *Lewis v. Lewis*, 189 P.3d 1134, 1141 (Colo. 2008) (emphasis added).  Or as plaintiff puts it, "the question to be resolved … is whether ARCO was enriched through the use of Plaintiffs' trade secret information."  (Pltfs. Mem. 38.)

In order to prove that the alleged use of Grynberg's information caused ARCO to be enriched, plaintiff must show that the information was a contributing factor in ARCO's ultimately profitable investment decisions.  Under New York law, "where the remedy being sought is a restitutionary one to prevent the fiduciary's unjust enrichment," the causation element is satisfied by demonstrating that the breach of duty was a "substantial factor" in the benefit obtained by the defendant.  *LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999).  Likewise in Texas, to show breach of fiduciary duty a plaintiff "must prove proximate causation," and the test "is whether the defendant's conduct was a substantial factor…."  *S & I Management, Inc. v. Sungju Choi*, --- S.W.3d ----, No. 05-09-00948, 2011 WL 208897 at *4 (Tex. App. Jan. 25, 2011).  Not dissimilarly, under Colorado law "[t]o establish causation, the plaintiff must prove that the defendant's conduct was a substantial

contributing cause…" *Rubert v. Clayton Brokerage Co. of St. Louis, Inc.*, 737 P.2d 1106, 1112 (Colo. 1987).  Plaintiff cannot survive summary judgment because there is no genuine issue of fact as to whether his information, even if used by ARCO in some way was a substantial factor in, or substantial contributing cause of, the company's ultimately profitable investment decisions.

First, the information Grynberg provided to ARCO from 1990 to 1992 was stale by the time ARCO was considering the Tengiz and Caspian pipeline opportunities.  *See Fox Sports Net North, L.L.C. v. Minn. Twins P'ship*, 319 F.3d 329, 336 (8th Cir. 2003) (obsolete information cannot form trade secret because the information no longer has economic value).  Mr. Grynberg has admitted as much.  In his deposition when asked "the information you had given [ARCO] in 1990 was outdated by 1996, wasn't it," he answered, "Of course it was."  (Rhodes Decl. Ex. 10, Grynberg Dep. 515:12-15.)  Even without that admission, it does not stand to reason that ARCO would invest billions of dollars on the basis of six-year old information in its files.

Second, the advantages of Grynberg's information over publically available sources were no longer relevant by 1995.  Plaintiff's expert report discusses why Grynberg's information was superior to the materials available in the public domain, but the explained basis for that superiority is primarily Grynberg's input regarding the availability of mercaptan free oil in the deep Devonian Horizon at Tengiz, information that was no longer important in 1995.  Mercaptans are essentially poisons that were found in much of the Tengiz oil, significantly reducing its potential value as of 1990.  Accordingly the knowledge that the Devonian layer was deep and contained mercaptan free oil would have been very useful to a potential investor in 1990.  As Mr. Grynberg

explains, the publically available sources were not as useful because although he told ARCO about the mercaptan-free Devonian, the publically available articles "do not mention the 37 meter penetration in the Devonian … do not mention anywhere the presence of mercaptans … [do] not stress that the tested oil from the Tengiz and Karachaganak Devonian had no mercaptans…[and] do not mention the feasibility of developing and producing the Tengiz Devonian oil if the mercaptan removal issue was not readily solved."  (Abrams Decl. Ex. B-3, Grynberg Expert Report at 3.)

However by 1995, mercaptan was readily removable because "Chevron solved the [mercaptan] problem."  (Rhodes Decl. Ex. 9, Grynberg Dep. 516:6-7; Id. at 555:17-556:24 (explaining that Mr. Grynberg learned from Dick Matzke in either 1993 or 1995 that the mercaptan problem had been solved).  As Mr. Grynberg has explained, Chevron solved the problem "by giving more money to the Azan Institute that was almost there but they didn't finish and their research was transferred to the division of Halliburton, Brown and Root, in England, that designed the equipment, built the equiptment and that's how oil is being sold from Tengiz." (Id. at 10-18.)  Since the mercaptan issue had been solved, Mr. Grynberg's information relating to the removal of mercaptans and the mercaptan-free oil in the Devonian was no longer material; like the rest of his information it was outdated.  Yet aside from the mercaptan issue, plaintiff's experts have not explained why Grynberg's information would have been any better than the publically available data sources recovered from ARCO's files, such that it would have been a substantial factor in ARCO's investment decisions.

Finally, Grynberg's information could not have factored into ARCO's investment decisions because ARCO based the Tengiz and Caspian pipeline decisions on superior

data stores in the Chevron and Oman data rooms.  (Rhodes Decl. Ex. 10, Jinks Dep. at 75-81; 83-84; Rhodes Decl. Ex. 7, Eisele Dep. at 29-31; 106-108; Rhodes Decl. Ex. 2, Boubel Dep. at 27:23-25, 76:12-77:10; Rhodes Decl . Ex. 4, BP 30(b)(6) Dep. at 65:13-16.)  Plaintiff attempts to sidestep this problem by noting that "because no new wells were drilled in Tengiz between 1990 and 1996, the information ARCO received from Chevron to TCO was largely based on the same information Plaintiffs originally provided, described or made available to ARCO."[8]  (Pltfs. Mem. 44.)  However whether or not the up-to-date data room information was the same as Mr. Grynberg's does not change the fact that ARCO visited and relied on the up-to-date data rooms in its analyses, as the record reflects it did.  Mr. Grynberg's information could not have been a substantial factor in decisions made with the benefit of the complete and contemporaneous data room sources provided by Chevron and Oman.[9]

---

[8]  Plaintiff's only support for this contention is Mr. Grynberg's rebuttal expert report.  To this Court's novice eye, the contention that after six years of operating the Tengiz field, Chevron would have no new or different data than it did when it entered the field in 1990 is suspect.  But as discussed in the main text, even taking this proposition at face value does not lead to the conclusion, as plaintiff would have it, that ARCO did not rely on the Chevron data trip information as the basis for its investment decision.

[9] Plaintiff also attempts to sidestep the data rooms by arguing that ARCO had really decided to invest in Tengiz and the Caspian pipeline before it invested in them or visited their respective data rooms, and that the trips were mere "due diligence" to confirm what ARCO had learned from Grynberg.  This argument is a red herring—plaintiff has not proffered any evidence in support of it, and the record indicates that the data room trips were serious substantive ventures taken before ARCO gave approval to either of the relevant projects.  (*See infra pg.* 7-10; Def. Rep. Mem. 26-27.)

There is no genuine issue of fact as to whether plaintiff's information, even if used by ARCO, was a substantial factor in, or substantial contributing cause of, the company's ultimately profitable investment decisions. Accordingly, summary judgment for defendant is appropriate.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment [90] is GRANTED and this case is DISMISSED.  Plaintiff's cross-motion to dismiss defendant's eighth and ninth affirmative defenses [99] is DISMISSED as moot.

SO ORDERED.

Dated: New York, New York
  March 30, 2011

             Richard J. Holwell
            United States District Judge